IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PHALYON L. MCFARTHING (Y-33546), ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 19 C 0777 |
| CORRECTIONAL OFFICERS COLONE, ) | |
| CARTER, FETT, NORWOOD, ABUTEEN, ) | Judge Rebecca R. Pallmeyer |
| and ALCARAZ, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

State prisoner Phalyon L. McFarthing, formerly a detainee at the Cook County Jail, brings this *pro se* lawsuit, 42 U.S.C. § 1983, alleging that while detained at the Jail, he was confined for 22 days in a cell with a non-flushable toilet. Defendants, six correctional officers, move for summary judgment, arguing that Plaintiff has not demonstrated that the conditions were sufficiently serious to implicate the Constitution or that Defendants' actions were objectively unreasonable. Defendants also argue that Plaintiff is not entitled to compensatory damages because did not suffer a physical injury, that Plaintiff did not state a claim against Defendants in their individual or official capacities, and that any claim for injunctive relief is moot. As explained here, Defendants' motion is denied as to Plaintiff's individual capacity claims. Any official capacity claims or claims for injunctive relief are dismissed. This denial is without prejudice to any challenges Defendants may have to an award of compensatory damages.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). In determining "whether there is a genuine issue for trial," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), the court reviews record materials submitted by the moving party. Rule 56(c)(1). Once a party moving for summary

judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The court considers the nonmoving party's submissions generously, and will "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In this case, Defendants filed summary judgment materials consistent with the court's Local Rules ([44], [45], [47].) Also as required, Defendants provided Plaintiff with the Local Rule 56.2 Notice [45], explaining how Plaintiff should respond to Defendants' summary judgment motion and cautioning that the court would deem Defendants' factual contentions admitted if he failed to follow the procedures delineated in Local Rule 56.1. *See, e.g., Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Plaintiff filed a response to the motion, but did not reply to Defendants' submissions in the manner called for by the Local Rule. Instead, he filed a document labeled "Initial Disclosures", which consists of a response to his FOIA request for the names and badge numbers of the staff assigned to Division 9, Tier 3G, and portions of the Illinois Administrative Code governing cell conditions. (Initial Disclosures [53]). He also submitted a brief ("Local Rule 5110 notice" [54]) in which he disputes certain of Defendants' factual statements and arguments. The facts set forth in Defendants' Local Rule 56.1(a)(3) Statement are deemed admitted to the extent they are supported by evidence in the record. *See Keeton v. Morningstar, Inc.*, 667 F.3d 880, 884 (7th Cir. 2012). The court will, however, also consider factual assertions Plaintiff has made in response to Defendants' summary judgment motion, to the extent he has pointed to evidence in the record or could properly testify himself about the matters asserted. *See Boykin v. Dart*, No. 12 C 4447, 2014 WL 5611466, at *6 (N.D. Ill. Nov. 4, 2014) (Chang, J.) ("Although the Court is

entitled to demand strict compliance with Local Rule 56.1, it ordinarily affords *pro se* plaintiffs significant leeway in responding to summary judgment filings."). Further, the court takes account of Plaintiff's deposition testimony, including portions not mentioned in Defendants' Statement of Facts. *See Bentz v. Hardy*, 638 F. App'x 535, 536 (7th Cir. 2016) (unpublished) (holding that plaintiff's failure to properly respond to Defendants' Rule 56.1 Statement was not fatal where defendants principally relied on his deposition testimony in support of their motion.).

## **FACTS**

Beginning in 2016, Plaintiff was a pretrial detainee at the Cook County Jail. (Defs.' Stmt. [46] at ¶ 1.) Defendants, Officers Colone, Abuteen, Alcaraz, Norwood, Fett, and Carter were, at all relevant times, officers in Division 9 of the Jail. (*Id.* at ¶¶ 3-8.). Plaintiff was booked into the Jail in January 2016 and then moved, in July 2018, to Division 9, Tier 3G. (*Id.* at ¶¶ 11.)

At around 11:00 p.m. on July 16, 2018, Plaintiff's toilet in cell 3086 overflowed, and feces flowed onto the floor of the cell. (*Id.* at ¶ 20, 21.) Plaintiff cleaned up the mess with a towel, water, and shampoo. (*Id.* at ¶ 22.) He discarded the feces in the dayroom toilet the next morning. (*Id.*)

On the morning after the incident, Plaintiff reported the problem to Officer Abuteen, who told him she would put in a work order. (*Id.* at ¶ 24; *see* Pl.'s Dep. [46-1] at 35:18-24.) Plaintiff did not at this time ask Officer Abuteen to move him to a different cell. (*Id.* at ¶ 25; *see* McFarthing Dep. [46-1] at 43:16-22.) Officer Abuteen did submit a work order for Plaintiff's toilet via e-mail. (*Id.* at ¶ 26; *see* Ex. A, Abuteen Affidavit [46-4] at ¶ 7.) She stated in an affidavit that the toilet issue "did not present an emergency," that Plaintiff had access to the toilets in the dayroom, and that she allowed Plaintiff to use toilets in the dayroom when he requested permission during hours where he was otherwise locked in his cell. (Abuteen Aff. at ¶¶ 8-10.)

During the time relevant to Plaintiff's complaint, the dayroom for Division 9, Tier 3G, contained a television, chairs, and benches, toilets, sinks, and showers. (Defs.' Stmt. [46] at

3

¶ 12.) The bathroom for Tier 3G contained three toilets, two sinks, and nine showers.[1] (*Id.* at ¶ 13.) Depending on the day, Plaintiff had either early or late access to the dayroom. (*Id.* at ¶¶ 14-15.) On days with early access, Plaintiff was allowed outside his cell from 7:30 a.m. to 10:30 a.m. and from 3:30 p.m. to 6:30 p.m. (*Id.* at ¶ 14.) On days with late access, Plaintiff was allowed outside his cell from 10:30 a.m. to 1:30 p.m. and from 6:30 p.m. to 9:30 p.m. (*Id.* at ¶ 15.) Plaintiff's normal schedule thus provided him with six hours a day outside his cell and with access to the dayroom. (*Id.* at ¶ 16.)

That schedule was interrupted, however, according to Plaintiff, from July 20, 2018 through July 12, 2018, and for five days during the first week of August 2018, when Tier 3G was locked down. (*Id.* at ¶ 17.) Plaintiff did testify that Defendants did not prevent him from using the "communal facilities" during the time relevant to the lawsuit (*id.* ¶ 18, citing McFarthing Dep., at 56:22—57:2), but he also testified he had no access to the dayroom from July 20 through July 23. (McFarthing Dep. at 51:18-22.) During this time, Plaintiff urinated in the sink and defecated into toilet paper and cups that Plaintiff and his cellmate placed in the corner of the cell. (*Id.* at 52:4-11.) From July 20 to July 23, Plaintiff and his cellmate accumulated two 16-ounce tumblers in the corner of the cell filled with human waste. (*Id.* at 52:18-53:2.) During the second lockdown, Plaintiff testified that he and his cellmate again tried to use the toilet, but it overflowed with water and was unusable. (*Id.* at 56:16-21.)

The Cook County Department of Facilities Management ("DFM") is responsible for repairing and maintaining the facilities at the Cook County Jail, as well as processing and responding to work orders submitted by correctional officers. (*Id.* at ¶ 30.) Correctional officers can submit such work orders through DFM software. (*Id.* at ¶ 31.) As detailed below, after first

---

[1] The court is uncertain whether the toilets, sinks, and showers in the "bathroom for Tier 3G" are the same as, or in addition to, the ones that are associated with the dayroom.

reporting the problem to Officer Abuteen, Plaintiff told several other Defendants that this toilet was not working, and they told him either that they had called or placed a work order for the issue. (*Id.* at ¶ 32.)

**Officer Norwood**: Plaintiff could not recall the date he notified Officer Norwood of the problem with his toilet. (*Id.* at ¶ 33.) Officer Norwood, a first-shift officer, told him she would look into the issue and allowed Plaintiff extra dayroom time to use the toilet. (*Id.* at ¶ 38; *see* Pl.'s Dep [46-1] at 45:7-20.) Officer Norwood submitted a work order to DMF on July 25, 2018. (*Id.* at ¶ 39; *see* Ex. F, Norwood Aff. [46-6] at ¶ 7; Ex. Fa [46-7].)

**Officer Colone**: Plaintiff was also unable to recall the date he first told Officer Colone about the non-working toilet (*id.* at ¶ 34), but he recalled at least one conversation after Colone, a second shift officer, was already aware of the problem. (*See* McFarthing Dep. [46-1] at 46:13-14.) Plaintiff asked to be switched to another cell, for the problem to be fixed, or for Plaintiff to be allowed to come out of his cell at night to use the bathroom. (*Id.* at 46:14-16.) According to Plaintiff, Officer Colone agreed to all three requests. Plaintiff does not know whether Officer Colone ever put in a work order (*id* at 46:17-21), but Officer Colone did allow him to come out of his cell and use the bathroom after inmates were locked down for the night. (*Id.* at 47:18-24.)

In an affidavit, Officer Colone stated that Plaintiff never asked to be transferred to a different cell, and that Colone submitted a work order for the toilet to DMF in July 2018. (Defs.' Stmt. [46] at ¶ 42; *see* Ex. C, Colone Aff. [46-3] at ¶ 6, ¶ 11.) In Officer Colone's view, at the time he submitted the work order, the situation in Plaintiff's cell "did not present an emergency." (Colone Aff. at ¶ 8.)

**Officer Carter**: Plaintiff could not remember when he told Carter, a first-shift officer, about the issue, but recalled that Officer Carter assured him he would look into it. (Defs.' Stmt. [46] at ¶ 35; *see* McFarthing Dep. [46-1] at 48:3-14.) Officer Carter did not give Plaintiff a work order number. (McFarthing Dep. at 48:15-16.) Officer Carter did tell Plaintiff he would try to carry out

5

Plaintiff's request to be moved to another cell. (*Id.* at 48:19-22; *see* Defs.' Stmt. at ¶ 43.) At the time he communicated with Carter, the contents of Plaintiff's toilets were not overflowing, and Plaintiff and his cellmate had cleaned up the mess from the overflow. (*Id.* at 49:1-6; *see* Defs.' Stmt. at ¶ 44.)

**Officer Fett**: Plaintiff testified that he spoke to Officer Fett, a second-shift officer, in the evening on a date he could not recall specifically. (*Id.* at 49:7-14.) According to Plaintiff, Officer Fett told him that he already knew about the issue and that a work order had already been placed for the toilet repair. (*Id.* at 49:14-18; *see* Defs.' Stmt. at ¶ 45.) Plaintiff testified that he asked Officer Fett why he was still in the same cell, and Officer Fett said he would look into it. (*Id.* 49:19-24.) At the time of this conversation, Plaintiff understood that a work order had already been generated because Officer Abuteen had told him she had submitted one. (*Id.* at 51:4-13.) Officer Fett, for his part, testified that he was not scheduled to work in Division 9, Tier 3G from July 17, 2018 through August 8, 2018, and was unaware of the problem with Plaintiff's toilet. (Defs.' Stmt. at ¶ 46; *see* Ex. K, Fett Aff. [46-14] at ¶¶ 4-9.)

**Officer Alcarez**: Finally, Plaintiff testified that he spoke to Officer Alcarez, again on a date he could not recall, and asked whether he could be moved to another cell; Alcarez told Plaintiff he would look into it. Plaintiff could not remember on what date he spoke to Officer Alcaraz about the broken toilet. (Defs.' Stmt. [46] at ¶ 36; McFarthing Dep. [46-1] at 50:21-24.) At the time of this conversation, as well, Plaintiff believed that Officer Abuteen had already submitted a work order. (*Id.* at 51:1-13; *see* Defs.' Stmt. at ¶ 48.) The toilet in his cell was not overflowing at this time. (*Id.* at 51:14-17.)

Plaintiff testified that Officers Norwood, Colone, Fett, and Carter allowed him to use the dayroom toilet at times when Plaintiff was not scheduled to have dayroom access. (Defs.' Stmt. at ¶ 37; *see* Pl.'s Dep. [46-1] at 64:14-65:6.) Plaintiff further testified that he had six hours of dayroom access on July 24, 2018, July 25, 2018, July 26, 2018, and July 27, 2018. (Defs.' Stmt.

6

at ¶¶ 50, 52-54.) But Plaintiff testified that at some point during the first week of August (Plaintiff could not pinpoint the exact day), there was a five-day lockdown during which he had no dayroom access. (*See* McFarthing Dep. at 54:21-55:15.)

Records show that three work orders were sumitted for repair of the toilet in Plaintiff's cell—one on July 20, 2018, one on July 24, 2018[2], and a third on August 3, 2018. (Defs.' Stmt. at ¶ 55.) In an affidavit, Joseph Merkel, a plumber foreman for DFM, stated that the first two work orders were completed on August 1, 2018, by plumbers who rodded the toilet pipeline and the main plumbing stack connected to the toilet in Plaintiff's cell. (*Id.* at ¶ 57; *see* Ex. H, Merkel Aff. [46-9] at ¶¶ 7-8.) According to Plaintiff, however, the toilet was not in fact fixed until August 8, 2018, 22 days after the problem began. (*Id.* at ¶ 60.) Plaintiff had filed a grievance regarding the broken toilet on July 31, 2018. (*Id.* at ¶ 58.) That grievance resulted in the third work order being generated. (*Id.* at ¶ 61.) On August 8, 2018, plumbers completed this work order, using the same rodding process as before. (*Id.* at ¶ 59; see Merkel Aff. at ¶ 9.)

Plaintiff testified that although several officers told him they would "look into" his request for a move, or that he could refuse lockup and be taken into segregation, Defendants did not otherwise allow him to transfer to another cell. (Pl.'s Dep. [46-1] at 75:5-18.) He testified, further, that he suffered stress and stomach cramping as a result of the odor from the toilet, and received no medical treatment for this. (*Id.* at ¶¶ 49, 65-66.) Plaintiff stated that he submitted a medical slip on July 24, 2018, but received no response, and did not follow up because other inmates told him it would be futile. (*Id.* at ¶ 51.)

---

[2] Although the dates differ, this appears to be a reference to the work order submitted by Officer Norwood on July 25, 2018. (*See* Ex. Fa [46-7].)

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

To survive summary judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of his case on which he bears the burden at trial. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citing *Celotex*, 477 U.S. at 322-23). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (internal quotation and citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 334 (7th Cir. 2011) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

**ANALYSIS**

Because Plaintiff was a pretrial detainee at the relevant time, his claims are assessed under the Fourteenth Amendment's Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019). Pretrial detainees cannot be held in conditions that "'amount to punishment.'" *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 856 (7th Cir. 2017) (quoting

*Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). A pretrial condition can amount to punishment in two ways: if it imposed for the purpose or punishment, or if it is not reasonably related to a legitimate goal, that is, if the condition is arbitrary or purposeless. *Mulvania*, 850 F.3d at 856 (citing *Bell*, 441 U.S. at 538–39).

A pretrial detainee establishes a claim for unconstitutional conditions of confinement by showing that: (1) he was subjected to conditions that "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health;" (2) defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017); *see Miranda v. Cty. of Lake*, 900 F.3d 335, 351–54 (7th Cir. 2018). It is not enough to show negligence or gross negligence. *Miranda*, 900 F.3d at 353–54. In seeking summary judgment in their favor, Defendants argue that: (1) the broken toilet was not sufficiently serious to pose an unreasonable risk of serious damage to Plaintiff's health; (2) Plaintiff has not demonstrated that Defendants' actions were objectively unreasonable; (3) that Plaintiff did not suffer a physical injury, and thus cannot recover compensatory damages; and (4) Plaintiff did not state an official capacity claim and cannot seek injunctive relief.

**I. Objectively Serious Condition**

"[A]dequate toilet facilities 'are among the minimal civilized measure of life's necessities that must be afforded prisoners.'" *Akindele v. Arce*, No. 15 C 5952, 2017 WL 467683, at *4 (N.D. Ill. Feb. 3, 2017) (Feinerman, J.) (citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012)), *see also Mims v. Hardy*, No. 11 C 6794, 2013 WL 2451149, at *10 (N.D. Ill. June 5, 2013) (Kendall, J.) (collecting cases and observing that "unsanitary conditions of confinement arising from broken plumbing" may rise to the level of a constitutional violation). That said, a short-term

9

breakdown, where the inmate otherwise has access to drinking water and alternative bathroom facilities, does not violate the Constitution. *See Akindele*, 2017 WL 467683, at *4.

In arguing that the broken toilet was not sufficiently serious to amount to a constitutional deprivation, Defendants characterize the deprivation as "smelling an odor or requesting to use an alternate toilet." (Defs.' Mem. in Support. of Mot. for Summ. J. [47], at 6.) Plaintiff was not deprived of basic life necessities, Defendants assert, because he had access to the toilets in the dayroom for six hours a day. (*Id.* at 7–8.) Defendants also contend they gave Plaintiff additional access to the dayroom at other times because they knew his toilet was broken. (*Id.* at 8.) They argue that "Plaintiff received scheduled and unscheduled dayroom toilet access for 22 days." (*Id.*)

Construed in the light most favorable to Plaintiff, however, the record does not eliminate factual disputes on these issues. Plaintiff contends that the tier was locked down twice during the relevant time period, first from July 20 to July 23, and then later at some point during the first week of August. During the first lockdown, he described urinating in the sink and defecating in cups that then accumulated in the corner of the cell. (*See* Pl.'s Dep. [46-1] at 52:4-53:2). Although the record is not entirely clear, it appears that he also had to do so during the second lockdown, when he reportedly had no dayroom access. (*See id.* at 54:21-55:15.) Plaintiff further contends even when they were not on lockdown, he and his cellmate sometimes had to use a cup to defecate at night, and then dispose of the waste in the morning in the dayroom toilet. (*Id.* at 52:11-17.) And he states in his response that Defendants did not give him any cleaning supplies during the 22-day period, even though they knew he was using his sink to urinate. (Pl.'s Resp. [54] at 12.) Plaintiff also had to use the same sink to wash his clothes and drink water. (*Id.* at 13.)

Defendants make two arguments in rebuttal: First, they contend that the evidence shows there were no three- or five-day lockdowns during the period relevant to Plaintiff's complaint. They rely on an affidavit from Lt. Trent Williams, who worked in Division 9 of the jail during July and August 2018. (*See* Ex. L, Williams Aff. [46-16]). Lt. Williams states, in relevant part, that his

10

duties included documenting, tracking, and updating the Living Unit Logs and the Watch Commander Log Books. (*Id.* at ¶ 3.) Lt. Williams states that during July and August 2018, the Cook County Department of Corrections had a written policy that required the preparation, maintenance, and retention of permanent log and shift reports of both routine activities and unusual events. (*Id.* at ¶ 4.)

The purpose for maintaining these Watch Commander Log Books was to track the equipment on a specific tier, document the assignments of correctional officers to specific tiers, and note any unusual occurrences for the following shift. (*Id.*) Watch Commander Log Books include the following information: the inmate count at the beginning, middle, and end of each shift; key count and exchange records; money count (where applicable); notes of exchange of security equipment; the time[s] the supervisor made rounds; information that would assist the oncoming shift; and "unusual occurrences." (*Id.* at ¶ 5.) According to Lt. Williams, information regarding lockdowns and fights are noted in the "Unusual Occurrences/Comments" section of the Watch Commander Log Books. (*Id.* at ¶ 6.)

Defendants have submitted the Watch Commander Log Books from July 20, 2018, through August 5, 2018, which Lt. Williams has identified as authentic business records that were prepared, used, stored, and retained in the regular course of business. (*Id.* at ¶ 7.) The court found no reference to any three- or five-day lockdowns in the Watch Commander Log Books, but much of the information in those records is redacted. The court notes, further, that the record does not include the "Living Unit Logs" to which Lt. Williams referred, except for what appears to be one such log from July 21, 2018. (*See* Ex. La Tier Log, 7/21/2018, DIV9-3G [46-17], at 7-10.) That log notes that a fight occurred, resulting in the tier being locked down for the rest of the shift. (*Id.* at 10.) That reference aside, it does not appear that any section of the Watch Commander Log Book specifically addresses lockdowns. Nor is it clear from Lt. Williams' affidavit whether officers are required to note lockdowns in the "Unusual Occurrences" section of the Watch

11

Commander Log Books or whether this is simply information that officers may include on the log. The Living Unit Logs may shed more light on whether any lockdowns occurred and how long they lasted, but apart (possibly) from the July 21, 2018 log, those Living Unit Logs do not appear in the record.

Moreover, even if the absence of any documentation of a three- or five-day lockdown on the Watch Commander Log Books makes it less likely that lockdowns occurred, the court will not make a credibility determination on summary judgment. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Nor is the court willing to weigh the evidence or decide what inferences to draw from the facts, even "in cases where the facts and inferences appear to lead more strongly to one conclusion than another." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010). Instead, interpreting the evidence in favor of Plaintiff requires the court to credit his assertions that the lockdowns occurred during the time the toilet in his cell was broken, and that he was subjected to the conditions he described during those lockdowns.

Next, Defendants note Plaintiff's testimony that Defendants did not hinder him from using the "communal facilities" from July 17, 2018, through August 5, 2018. (*See* McFarthing Dep. [46-1] at 56:22-57:2.) The court is uncertain of the relationship between "communal facilities" and the bathroom facilities in the dayroom because that term was not used at any other point in Plaintiff's deposition, nor otherwise defined. Assuming the terms are synonymous, the testimony does not make clear that Plaintiff had access to these communal facilities during the lockdowns he described; he specifically testified that he did not have access to the dayroom during the lockdowns. (*See id.*. at 51:18-53:2 (discussing the July 20 through July 23 lockdown) and 54:21-55:15 (discussing the lockdown during the first week of August)).

In determining whether he experienced an objectively serious deprivation, the court must take into consideration the totality of the conditions that Plaintiff experienced, including his testimony that during lockdown periods he and his cellmate were forced to urinate in the sink and

12

defecate into cups that were then collected in the corner of his cell. *See Thomas v. Illinois*, 697 F.3d 612, 614–15 (7th Cir. 2012) (when assessing the objectively severity of unsanitary conditions, the court must consider their nature and duration, as well as any resulting harm, physical or psychological); *see also Jaros*, 684 F.3d at 671 (extent, duration, and consequences are relevant to determining whether conditions violate the Constitution).

In support of their motion, Defendants do not address these more serious concerns, instead arguing Plaintiff's rights were not violated by having to use the non-flushable toilet in his cell while waiting for it to be fixed. But the cases Defendants cite are distinguishable. In *Akindele*, for example, during the nine-day period in which the plaintiff's toilet was broken, plaintiff had access to the dayroom for 90 minutes each morning and evening, and unscheduled access at other times upon request. 2017 WL 467683, at *4. In finding that the conditions did not rise to the level of a Constitutional violation, the *Akindele* court observed that "no record evidence suggests that [plaintiff] was unable to maintain basic personal hygiene despite the presence of a non-flushing toilet covered by a towel." *Id.* The *Akindele* court thus found that the conditions in the plaintiff's cell—a clogged toilet that emitted foul odors, but which was covered with a towel—fell short of the harsh conditions deemed unconstitutional in other cases. *Id.* (citing *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 2007) (finding a possible constitutional violation based on allegations that the walls of the prisoner's cell were smeared with human waste, the water was turned off, and plaintiff was refused cleaning supplies)). Similarly, in *Wilkins v. Merkle*, No. 13 C 375, 2015 WL 5544312, at *5 (N.D. Ill. Sept. 18, 2015), the court held that a lack of working plumbing for thirteen days (standing alone) did not violate the Constitution, but it was undisputed that the plaintiff had access to toilets in the dayroom.

Here, taking the evidence in the light most favorable to Plaintiff, there were eight days during the 22-day period in which his toilet was broken that he did not have access to the toilets in the dayroom and could not use the toilet in his cell, which overflowed when Plaintiff and his

13

cellmate tried to flush it. During this time, and sometimes overnight, Plaintiff and his cellmate were forced to urinate in the sink and defecate in cups that accumulated in the cell. Plaintiff contends that he had to use the same sink to wash his clothes and drink water and that he did not receive cleaning supplies to clean the sink or his cell.

A reasonable jury could find from these circumstances an objectively serious deprivation. Courts have recognized that "even limited exposure to human waste can constitute an unconstitutional condition of confinement." *Oswald v. Manlove*, No. 16-cv-991-PP, 2019 WL 464135, at *12 (E.D. Wis. Feb. 6, 2019) (Pepper, J.); *see also Wheeler v. Walker*, 303 F. App'x 365, 368 (7th Cir. 2008) (unpublished) (observing that exposure to human waste not only raises health concerns, but evokes "the more general standards of dignity embodied in the Eighth Amendment.") (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)). In circumstances similar to those Plaintiff complains of here, courts have found a question of fact as to whether the deprivation was constitutionally significant. *See Smith v. Groves*, No. 3:15-cv-1138, 2018 WL 1071720, at *3 (S.D. Ill. Feb. 26, 2018) (Rosenstengel, J.) (prisoner confined to his cell for six days (21 hours each day) with no running water, an unflushable toilet filled with human waste, and no cleaning supplies brought forth sufficient evidence at summary judgment stage that he was denied adequate sanitation); *Steele v. Knight*, No. 13-cv-00982, 2016 WL 7117155, at *7-8 (S.D. Ind. Dec. 7, 2016) (Magnus-Stinson, J.) (prisoner described sufficiently serious deprivation where he was confined in a cell without a sink or toilet, his requests to use to restroom at night were frequently ignored, and he had to defecate and urinate in containers); *Lindsey v. Esser*, No. 14-CV-357-JDP, 2015 WL 5032659, at *4 (W.D. Wis. Aug. 25, 2015) (Peterson, J.) (a jury could find an inmate endured a sufficiently serious deprivation when he was confined for four days to a cell without running water or a functioning toilet). In light of all the evidence, a jury could find that Plaintiff did not have access to adequate toilet facilities in order to maintain hygiene.

**II.     Culpable State of Mind**

Whether each Defendant can be held liable for the alleged deprivation is a separate question. Before addressing this question, the court acknowledges that provisions of the Illinois Administrative Code, cited by Plaintiff in his response to the motion, require that municipal detention facilities have toilets within the cell if detention is for more than eight hours. Ill. Admin. Code tit. 20, § 720.50(d)(3). Plaintiff also points to a section of the Code pertaining to county jails and requiring that "[t]oilets, washbasins, shower stalls and sinks shall be thoroughly cleaned and sanitized each day with detergent and a germicidal agent." Ill. Admin. Code tit. 20, § 701.120 (b)(1). Those provisions provide guidance, but to prevail here, Plaintiff must establish a constitutional violation, not violations of state law or regulations. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *see also Jackson v. Duran*, No. 15 CV 1846, 2017 WL 8217063, at *5 (N.D. Ill. Dec. 14, 2017) (Norgle, J.) ("even if Plaintiff's confinement in a cell that lacked water violated jail rules, a civil rights action under Section 1983 must be based on a constitutional violation."); *Whitehead v. Dart*, No. 14 C 1656, 2016 WL 7256958, at *7 (N.D. Ill. Dec. 14, 2016) (Castillo, J.) (whether Defendants complied with an interagency directive regarding measurement of cell temperatures was "of little relevance" to the issue of whether inmates were denied adequate heat in violation of the Fourteenth Amendment).

The issue in this case is whether Defendants knew or should have known of a serious risk to Plaintiff's health and failed to respond reasonably. The court examines this issue as to each Defendant, a difficult task because there are disputed issues of fact as to whether Plaintiff's tier was on lockdown during this time period, and how bad the conditions in his cell became. Additionally, Plaintiff could not recall in his deposition testimony the date that he notified Officers Norwood, Colone, Carter, Alcaraz, and Fett about this issue, and Defendants' affidavits do not shed light on this issue.

Defendants argue that in submitting working orders and allowing Plaintiff toilet access, they responded reasonably, and that the Constitution does not require immediate cell transfer in

15

response to a clogged toilet. (*See* Mem. in Supp. of Motion for Summ. J., Dkt. No. 47, at 9.) Defendants emphasize that the toilet was not continuously overflowing, and that Plaintiff was able to clean up the waste from the one incident in which feces overflowed onto the floor. (*Id.*)

With respect to Defendant Abuteen, she stated in her affidavit that she submitted a work order for Plaintiff's toilet, but did not state when she did so. (Abuteen Aff. [46-4] at ¶ 7.) It appears from the record that the first work order was submitted on July 20, 2018, three days after Plaintiff states that he reported the problem. (*See* Merkel Aff. [46-9] at ¶ 6.) Assuming there was in fact a three-delay in submitting the work order, Defendants have not explained that delay. Officer Abuteen's affidavit simply states that the "toilet issue did not present an emergency" and that she allowed Plaintiff to use the restroom in the dayroom during "inmate lock-in hours." (Abuteen Aff. [46-4] at ¶ 8, 10.) Plaintiff himself testified that Officer Abuteen did not allow him additional bathroom access. (*See* McFarthing Dep. [46-1] at 65:8-9.) Even if she did, there is no record that Officer Abuteen took any additional steps to follow up on the work order, during the twelve days between the first work order and the first (and apparently unsuccessful) attempt to unclog Plaintiff's toilet, or during another week that passed before the toilet was fixed. For at least part of this time, according to Plaintiff, he was locked in his cell with no access to the dayroom.

Defendants are correct that a broken toilet may not require an immediate cell transfer, but the length of time the problem persists (and the conditions that develop due to the broken toilet) are relevant to whether an officer's response is reasonable. Submitting a work order and allowing dayroom access may be adequate initially, but that response, without more, may not be adequate where there is no action on the work order for several days, or where lockdown conditions caused human waste to accumulate in Plaintiff's cell. A reasonable jury could find the failure to take additional action in these circumstances unreasonable. *See Smith*, 2018 WL 1071720, at *3 (officers could be found culpable where they put in a work order regarding non-functioning plumbing in prisoner's cell, but did not follow up on that order, inquire about a cell change, or

provide cleaning supplies); *Rogers v. Ashworth*, No. 15-CV-765-SLC, 2017 WL 5312199, at *6 (W.D. Wis. Nov. 13, 2017) (Crocker, M.J.) (finding in case involving cell stained with blood and feces that failure to move plaintiff to another cell, order workers to clean it, provide plaintiff with cleaning supplies, or notify a supervisor of the situation could constitute deliberate indifference).

These issues prevent summary judgment in favor of the remaining Defendants as well:

- Officer Norwood allowed Plaintiff to extra dayroom time to use the toilet, but did not submit a work order until July 25, 2018. Depending on when she first learned of the problem, it is not clear that this was a reasonable response.

- Officer Colone contends that he allowed Plaintiff to use the restroom in the dayroom "on one occasion" andsubmitted a work order for Plaintiff's toilet. (Colone Aff. [46-3] ¶¶ 6, 10.) The record is unclear on this point, as it appears that the third work order was generated as result of Plaintiff's grievance. (*See* Defs.' Stmt. [46] at ¶ 61; *see also* Grievance Resp. Ex. to Pl.'s Compl. [6], at 10 (stating that the correctional rehabilitation officer had notified DFM, and a work order number had been generated). Although Officer Colone denies it, Plaintiff testified that he asked Officer Colone for a transfer to another cell. (*Compare* Colone Aff. [46-3] at ¶ 12 *with* Pl.'s Dep [46-1] at 46:13-17.)

- Plaintiff testified that Officer Carter promised to look into the toilet issue and to try to move Plaintiff to a different cell and allowed him dayroom access at unscheduled times. (*See* McFarthing Dep. [46-1] at 48:3-22; 64:14-65:6.) Whether Officer Carter ever followed through is unclear. Several other Defendants similarly promised to "look into" the issue, and Defendants assert that "[a] jail official's promise to 'look into' an inmate's complaint does not show deliberate indifference where there is no evidence that the official did not perform the promised follow-up within a reasonable period of time." *Akindele*, 2017 WL 467683, at *5; *see Wilkins*, 2015 WL 5544312, at *6 (defendant could not be found deliberately indifferent where there was no evidence that plumbing issues continued after defendant submitted a work order). In *Akindele*, however, the malfunction lasted just nine days (not 22, as here), and there was evidence the problem was resolved promptly after Defendants said they would look into it. 2017 WL 467683, at *5.

- Officer Alcaraz was aware that a work order had already been submitted at the time Plaintiff raised the issue with him. (Alcaraz Aff. [46-5] at ¶¶ 6-7.) Officer Alcaraz did not witness any flooding and did not believe the situation presented an emergency. (*Id.* at ¶ 8.) He states that he allowed Plaintiff to use the restroom in the dayroom on two occasions when Plaintiff requested permission during inmate lock-in hours, and that Plaintiff never requested a cell transfer. (*Id.* at ¶¶ 10, 11.) Plaintiff disputes both of these assertions. (*See* McFarthing Dep. [46-1] at 65:8-9; 50:21-24.) And in addressing the issue of "emergency," it is not clear that Defendants considered any circumstances other than whether the toilet was currently overflowing.

- Officer Fett contends that he was not scheduled to work in Division 9, Tier 3G from July 17, 2018 through August 8, 2018, and was unaware of the problem with Plaintiff's toilet. (*See* Fett Aff. [46-14] at ¶¶ 4-9.) But there is evidence in the record that Officer Fett

17

covered a lunch break for Officer Colone on the evening of July 21, 2018 from 7 to 8 p.m., that Plaintiffs spoke to Officer Fett about the problem, and that Officer Fett said he would investigate. (*See* Tier Log, 7/21/2018-DIV9-3G [46-17] at 9-10; McFarthing Dep. 49:14-24.)

A reasonable jury might conclude that a toilet that does not function for several days and fills with human waste constitutes an "emergency" regardless of whether there was an overflow. A reasonable jury may also conclude that the absence of prompt action on work orders or a requested cell reassignment violates basic standards of decency. The trial evidence may well be inconsistent with Plaintiff's account, but the court concludes Defendants are not entitled to summary judgment on the ground that their responses were objectively reasonable.

### III. Lack of a Physical Injury

Defendants contend that because Plaintiff did not suffer a physical injury as a result of the lack of a functioning toilet, he is not entitled to compensatory damages. The Prison Litigation Reform Act bars recovery of compensatory damages in actions filed by prisoners alleging only mental or emotional injury, suffered in custody, without a prior showing of physical injury. *See* 42 U.S.C. § 1997e(e); *Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003) ("[A]bsent a showing of physical injury, § 1997e(e) would bar a prisoner's recovery of compensatory damages for mental and emotional injury.")

Plaintiff identified only stress and stomach cramping as injuries he suffered due to the broken plumbing. Although physical injury need not be significant, recovery is not available for injuries that are *de minimis. Mitchell v. Horn,* 318 F.3d 523, 536 (3d Cir. 2003); *see also Flanory v. Bonn,* 604 F.3d 249, 254 (6th Cir. 2010) (collecting cases in which injuries including small bruises and "whirling sensation" in head after missed meal were *de minimis* injuries); *Oliver v. Keller,* 289 F.3d 623, 629 (9th Cir. 2002) (alleged injuries including leg and back pain for which prisoner did not seek treatment were *de minimis* under § 1997e(e)). The court recognizes that Plaintiff's injuries may be insufficient to support an award under this standard. That said, the court

notes that the demand for judgment is not considered part of a claim for the purpose of determining the sufficiency of a pleading. 5 Charles Alan Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1255 (3d ed. 2004); *see also Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) (same). The prayer for relief and the type of damages sought therein is not a part of the claims or defenses, then, and is not a proper subject for summary judgment. *See D.A. v. Meridian Joint Sch. Dist. No. 2*, 289 F.R.D. 614, 626–27 (D. Idaho 2013). The parties are encouraged to discuss settlement, but if the case proceeds to trial, this issue is appropriately resolved through a motion *in limine* prior to trial.

### IV.    Official Capacity Claim and Injunctive Relief

Finally, Defendants argue that Plaintiff has not stated an official capacity claim against Defendants and that he lacks standing to bring a claim for injunctive relief. Indeed, Plaintiff's claims are proceeding as individual capacity claims, as he has not identified a custom or policy of the Cook County Sheriff's Office that caused his injuries. *See Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005). To the extent Plaintiff intended to assert any official capacity claim, it is dismissed. Further, because Plaintiff is no longer housed in the Cook County Jail, any claim for injunctive relief is moot. There is no indication that Plaintiff is likely to be transferred back to Cook County Jail, or that, if he were to return, he would be subjected to the same conditions that are the subject of this lawsuit. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (when prisoner is transferred to another prison, his request for injunctive relief is moot unless "he can demonstrate that he is likely to be retransferred"). Therefore, any claim for injunctive relief is dismissed.

### **CONCLUSION**

Defendants' motion for summary judgment [44] is denied as to Plaintiff's individual capacity claims. Any official capacity claims or claims for injunctive relief are dismissed. This denial is without prejudice to Defendants' objection to any award of compensatory damages at

trial. This case is set for a telephone status conference on Monday, July 6, at 10:45 a.m. Defendants are to arrange for Plaintiff's telephonic appearance. The parties are encouraged to discuss settlement prior to the status conference, and to notify the courtroom deputy if a referral to the magistrate judge would be helpful in this effort.

ENTER:

Dated: June 16, 2020

_____
REBECCA R. PALLMEYER
United States District Judge